## CHAMBERS ET AL V. MAULDIN ET AL.

1. A subsequent incumbrancer is not bound to pay off prior liens, to entitle him to sell the property to pay his debt; but it is competent for him to go into Chancery to coerce a sale, and after the payment of such liens, obtain whatever balance may remain.

2. It is competent for a Court of Equity, under some circumrtances, to remove one trustee and appoint another in his stead.

3. *Semble*—Where property is conveyed in trust, with a power of sale, the directions of the deed as to the manner of the sale must be pursued.

4. The powers of a trustee over the trust property depend upon the nature of the trust and the terms employed in its creation ; and if not restricted, a trustee with a power of sale, may maintain *detinue* to recover the possession of personal property, and cannot, under ordinary circumstances, resort to Chancery for that purpose.

5. The grantor of slaves conveyed by deed, in trust for the payment of a debt, with a power of sale, is not liable for hire so long as he is permitted to retain their possession ; but if he transfer the possession to a third person, that person, after a demand of him by the trustee entitled to the possession, will be accountable for hire.

6. Where a *cestui que trust* takes possession of slaves conveyed for the security of a debt due, he becomes liable to account for their hire ; but where one purchases the interest both of the grantor and *cestui que trust,* and acquires the possession, he may elect to hold under the grantor ; and thus avoid the payment of hire accruing previous to the time he was called on by a junior incumbrancer, to direct a sale under his deed.

In June, 1839, the defendants in error filed their bill in the Chancery Court at Mobile, for an injunction, and the settlement of the priority of certain deeds of trust, executed by Platt Stout, in which the parties were respectively interested. The record is voluminous, and it will be quite sufficient to the understanding of the points here considered, to make a condensed statement of the facts as they may be gathered from the bill, answers and report of the Master.

On the 13th December, 1838, Platt Stout conveyed to Mauldin three negroes, to wit: Henry, Milley and Hannah, as also certain lands, particularly described ; in trust, to secure to Alexander Sledge the sum of one thousand dollars, which became due on the twenty-first of July preceding. On the 12th April, 1837, Stout conveyed to Aikin & Files, the slaves Henry

and Milley, in trust, to secure to Thos. E. Tartt the payment of sixteen hundred and twenty-nine dollars and twenty-five cents.

Stout, on the 4th April, 1839, sold and conveyed to Chambers his reversionary interest in the three slaves embraced in the deeds of trust above recited ; and on the 27th of the same month, Tartt sold and endorsed to Chambers four promissory notes, amounting in the aggregate to the sum of eight hundred and twenty-nine dollars and twenty-five cents, being the residue of the debt unpaid, which was intended to be secured by the deed of trust of April, 1837. At the time of the indorsement of the promissory notes, they, together with the deed of trust were delivered to the indorsee.

The terms of the deed to Mauldin, for the benefit of Sledge, authorizing a sale of the slaves on the failure of Stout to pay the debt intended to be secured, the trustee advertised a sale in obedience to its requirements; but before the day of sale arrived, Chambers had obtained possession of Milley, and was proceeding to sell the slaves through the agency of one or both the trustees in the deed for Tartt's benefit, without any notice whatever, under the pretence that he had all the interest of Stout and Tartt, and could dispose of them at pleasure. To restrain such a sale, was the object and effect of the injunction.

The decree declares, that Hannah did not pass to Chambers, in virtue of any of the deeds under which he claims, and that she is subject to sale under the deed of Stout to Mauldin, for Sledges security—that the proceeds of the sale of the two other slaves must be applied, first, to the satisfaction of the debt secured by the deed in favor of Tartt, and the balance, if any, must be appropriated to the payment of what may be due to Sledge. The priorities of the two deeds of trust being thus established, it was adjudged that, should the claims of the defendants conflict, the same may be adjusted by cross bill, to be filed for that purpose: *further*, that it be referred to the Master to take and state an account between the parties, and to ascertain and report the respective debts due, and owing, and secured by the two deeds of trust aforesaid ; and also the value of the hire of each of the slaves, from the time the plaintiff made the demand to the present time.

Under this reference a report was made, stating with partic-

ularity the amount due to Chambers, as the assignee of Tartt, as well as the amount due to Sledge. The Master also reported the value of the hire of Henry, Milley and Hannah respectively, from the time the complainant's bill was filed, there being no proof of a demand previously. This report was confirmed without exception.

Referring to the decree which settles the rights of the parties, the final action of the Court upon the report proceeds as follows, viz: " That the value of the hire of the slaves, as reported by the Master, be credited as a payment *pro tanto* of the debt secured by the deed of trust from Stout to Aikin & Files, for the benefit of Tartt. And that the Master sell the said slaves for cash, to the highest bidder, at public auction, after having duly advertised the same, in manner as required of the sheriff of Mobile county in the sale of personal property under execution; and that he apply the money arising from the sale toward the payment of the debts of the complainant and defendant, according to their respective rights and priorities, as settled by the former decree; and that the surplus, if any, after paying the costs, to pay over to Stout; and if there be no surplus, then he is to retain the costs out of the money which was to be applied to the defendant's debt."

To revise the decree of the Chancellor a writ of error has been sued to this Court.

CAMPBELL, for the plaintiffs in error. It is not pretended that there is any fraud on the part of Aikin & Files, as trustees under the deed for Tartt; a Court of Equity therefore is not authorized to interfere with the legal rights which it confers. The only equity of which the complainants could avail themselves is, to pay off the incumbrance of Tartt; but they have no right to force the parties to a sale, contrary to the terms of the deed. [1 Paige's Rep. 284.] Had it been shown that the trustees were guilty of a fraud, the power to sell might have been taken from them, or its exercise controlled by the Court.

Chambers is improperly charged by the decree with the hire of slaves not in his possession, as well as with the hire of Hannah, who is not embraced by the deed from Stout, for the benefit of Tartt. True, by the purchase of the residuary interest of Stout, Chambers acquired the right to redeem that slave

from the deed of trust for Sledge, but upon no principle of law, can the value of her hire be deducted as a payment *pro tanto* from the sum for the payment of which the other slaves are held in trust. Chambers was not accountable for the hire of Hannah as a *cestui que trust*, or assignee, for she was not conveyed by the deed under which he claimed.

Chancery will not enforce a claim for rent in favor of a mortgagee who has the legal title. If he wishes to receive the rent he may make an entry. In the present case, if the hire of Hannah was required for the satisfaction of Sledges demand, the legal right should have been enforced. [1 Jacobs & W. Rep. 647.] We have no statute in this State which interferes with the legal remedy of the mortgagee in such cases, and the English law will of course apply. [2 Paige's Rep. 586; 5 Paige's Rep. 38; 1 Powell on Mortgages, 298, *note*.] It will follow from what has been said, that Chambers is not liable to Sledge for any part of the hire, even if he had, and still enjoys, the uninterrupted possession of all the slaves.

LESESNE. for the defendant. The bill charges, and the answers of Chambers and Stout admit, that the former had possession of all the slaves in question on the day previous to the filing of the bill; and he cannot be permitted to avoid the payment of hire, by showing that he permitted Stout to enjoy the benefit of their services without an equivalent, any more than if he had stipulated for, and actually received, a compensation for their labor. [Cooper's Jus. and notes, 400; Chapman v. Tanner, 1 Vern. Rep. 269; Cropping v. Cook, id. 270; Coote on Mortgages, 558 and cases there cited.

It cannot be admitted that Chambers, as the purchaser from Stout, occupied the position of a mortgagor in possession, and consequently is not chargeable with hire. This is a special provision in favor of mortgagors; but does not extend to a grantor in a deed of trust, after default in the payment of the debt intended to be secured, where the trustee is authorized to to take possession of the trust estate. [Lewin on Trusts, &c. 87.] If Stout had retained the possession, Mauldin, as the trustee for Sledge, might have maintained detinue against him, and the measure of the recovery would have been the value of the slaves with their hires. It is needless to add more on

this point—the proof of demand of Chambers is perfectly conclusive.

As to the slave Milley, Chambers' possession commenced on the 4th April, 1839, when he purchased Stout's interest. In respect to Hannah, though he did not claim her under his contract with Tartt, yet he held her in virtue of his purchase from Stout, and is liable to account for her hire in the same manner, and to the same extent, as Stout would have been, had he never sold to him his right to redeem her.

The purchase of Tartt's interest can't place Chambers in a more favorable position; it merely invests him with the rights of Tartt, and made him liable to Stout in the same manner that Tartt was; and as Tartt, had he taken possession of Henry and Milley, would have been compelled to account for their hire to his grantor, the obligation to account rests upon Chambers.

The idea that the complainant's only equity is to redeem the slaves from the lien of Tartt's deed cannot be maintained, and requires no refutation.

COLLIER, C. J.—1. The adjustment of priority of lien between incumbrancers, and the appropriation of the proceeds of the property in dispute, is an acknowledged subject of equity jurisdiction. And although there may be no controversy as between the parties which shall be preferred in the order of payment, it is competent for a subsequent incumbrancer to go into Chancery to coerce a sale, and after the payment of prior liens, to obtain whatever balance may remain. True, if so inclined, he may purchase of the preferred creditors their demands, and thus acquire the right to control the securities which they held; yet, this is not the only course by which he can avail himself of his lien. If it was, he might lose all benefit of it, for the want of money or credit, though the object was adequate in value to the payment of all the debts, which it was conveyed to secure.

The case of the Western Insurance Company v. Eagle Fire Insurance Company, [1 Paige's Rep. 284,] does not lead to a different conclusion. There a mortgagee of certain premises filed a bill against a prior mortgagee of the same premises, praying that the mortgaged property might be sold, subject to

the incumbrance of the elder mortgage; or that the complain-
ant might be permitted to redeem the prior mortgage; or that
the whole interest in the mortgaged premises might be sold,
and the amount due to the complainants paid out of the pro-
ceeds of such sale, after satisfying the prior mortgage. To so
much of the relief prayed as sought a decree for the sale of the
premises a demurrer was filed, on the ground that such a de-
cree would give to the complainant, in the capacity of subse-
quent mortgagee, an undue control over the prior security of
the defendant. The Chancellor said, "The usual decree in
cases of this kind, in England, where strict foreclosures are
still in use, is, that the complainants be permitted to redeem
the prior incumbrances, that the junior incumbrancers redeem
in course or be foreclosed; and if the complainants are not en-
titled to a decree to sell the whole estate, and pay the prior in-
cumbrancers out of the same, they are at least entitled to re-
deem, and then sell the whole estate for the purpose of obtain-
ing the redemption money, as well as to satisfy their own in-
cumbrance. And if the prior mortgagees will not consent to a
sale, or the amount of their incumbrances is not yet due, I do
not at present perceive any valid objection to a decree for a
sale of the equity of the redemption, subject to their mortgages,
leaving the purchaser to pay the same as they become due, or
whenever the prior mortgagees think proper to enforce their
lien upon the premises." These remarks, so far from show-
ing that the complainant's only equity, is to redeem the pro-
perty conveyed from the lien of the deed for the benefit of
Tartt, tend rather to prove that it is entirely competent to or-
der a sale, subject to the prior satisfaction of the debt intended
to be secured. No prejudice can result to Chambers from the
exercise of such a jurisdiction, as the Court might direct that
the property be offered for sale, and that the lowest bid receiv-
ed should be the amount ascertained to be due upon the notes
of Stout to Tartt.

2. It is certainly competent under some circumstances for a
Court of Equity to remove an old trustee and appoint another
in his stead. [Lewin on Trusts and Trustees, 597, et post; 2
Story's Eq. 527.] But the bill in the present case contains no
allegation against the trustees in the deed for the benefit of
Tartt, nor is there any thing in the record to show that they

have not acted with entire propriety, or that they are unfit persons to execute the trust.

In Greenleaf v. Queen et al, [1 Pet. Rep. 138,] it was held, that where a deed conveys property in trust, to be sold for the benefit of a creditor of the grantor, the trustee must conform to the mode of sale pointed out by the deed; that this was the test of value which the grantor thought proper to require; and it was not competent to the trustee to establish any other, although by doing so, he might in reality promote the interest of those for whom he acted. We merely cite this case to show how strict the law is, in enjoining upon the trustee a conformity to the requisitions of the deed. We will not undertake to determine, (as it will be hereafter seen to be unimportant to a decision of the cause,) that there is error in the decree of the Chancellor upon this point; but we will remark, that it would be entirely regular to direct a sale to be made by the trustees in the deed under which Chambers claims, according to its terms, so far as they can be ascertained.

3. Upon the execution of a deed of trust, the legal estate vests in the trustee, for the benefit of the. cestui que trust, and he may defend the property at law. [2 Story's Eq. 241; Willis on Trustees, 123, et post; Fletcher on Estates of Trustees, 2, 3, 5, 9, 16, 23, 40, 72, 75, 80, 82, 85, 88, 91, 101.] The powers pertaining to a trustee over the trust property, depend upon the nature of the trust and the terms of the instrument by which it was created. [2 Story's Eq. 241; Lewin on Trusts, &c. 234, 412.] If not inhibited by the nature of the trust, or the instrument under which he acts, he may reduce it into possession. [Lewin on Trusts, &c. 295, 412.] And while the cestui que trust is obliged to resort to equity for the assertion or protection of his equitable title, an action at law may be maintained in the name of his trustee. "So fixed and immutable is this principle," said to be, "that a trustee may maintain an ejectment against his own cestui que trust." [Willis on Trustees, 201, and cases there cited.]

If a trustee may sue at law for the recovery of real property, upon principle, it would seem, he might sustain an action of detinue to obtain the possession of personal property. This being the case, we cannot perceive how the trustee can be permitted to go into equity against the grantor, or one claiming

under him, and seek a decree for the sale of personalty, when by reducing it into possession he has ample authority under the deed to sell.

The slave Hannah was not embraced by the deed from Stout for the security of the debt to Tartt, nor does it appear that she was ever demanded of the former, or was in the possession of Chambers; and there is an entire absence of any allegation, or proof, to show that ample relief could not be obtained at law. Indeed it is difficult to conceive of any allegation that would confer jurisdiction upon Chancery, in respect to Hannah, as the act of 1830, "To regulate proceedings in certain actions of detinue," [Aik. Dig. 263,] affords quite as ample protection to the rights of Mauldin or his *cestui que trust*, as a Court of Equity can. The record shows that the lien of the complainant upon this slave was paramount to all other claims; in fact it does not appear that any adverse right was set up by any one. Under these circumstances we are of opinion, that the Chancellor should not have charged Chambers with her hire, or have entertained the cause so far as it relates to her.

4. A mortgagor remaining in possession by the permission of the mortgagee is not bound to account for rents and profits although the security is insufficient; unless they are specifically pledged. [Coote on Mort. 332, et post, and 555; 1 Powell on Mort. 174-7; 3 id. 946, note; Ex parte Wilson, 2 Ves. & B. Rep. 252.] In the Bank of Ogdensburg v. Arnold, [5 Paige's Rep. 38,] it was held, if the whole amount secured by the mortgage has become due, and the mortgaged premises are not of sufficient value to pay the debt and costs, the Court, upon the filing of the bill, may, upon due notice to the defendant, appoint a receiver of the rents and profits of the premises, or otherwise secure such rents and profits for the satisfaction of the debt and costs. But it was said, where the mortgagee has neglected to take a specific pledge of the rents and profits of the mortgaged premises, for the security of his debt before it becomes due, he has no equitable right to the rents and profits in the meantime; and in case of the death of the mortgagor, his judgment creditors are entitled to a preference in payment, out of such rent and profits.

It has been said that the mortgagee is the legal owner of the

mortgaged premises, and may eject the mortgagor without no-
tice; that the latter is not entitled to emblements, nor is he au-
thorized to underlet, and if he does, the mortgagee may treat
his tenant as a trespasser. [1 Powell on Mort. 155; 6, 161;
6, 259, note; 2 id. 429, note.] And the mortgagee, by giving
notice to the tenant in possession, may recover the rent then in
arrear, or which may afterwards accrue. [1 Powell on Mort.
17-24.] This doctrine was declared by the Court of King's
Bench, in Moss v. Gallimore, [Doug. Rep. 266,] where the
tenant held under a lease made previous to the execution of
the mortgage.

But if a mortgagee take possession, he is considered in equi-
ty, in some measure, in the light of a trustee, and accountable
for the profits. [Coote on Mort. 320, 368, 556; Reed v. Lans-
dale, Hard. Rep. 7; Brainbridge v. Owen, 2 J. J. Marsh. Rep.
465; Whittick v. Kane, 1 Paige's Rep. 202; Robertson v.
Campbell, 2 Call's Rep. 421; Van Buren v. Olmstead, 5 Paige's
Rep. 9.] And where slaves are taken possession of by a
mortgagee, he becomes liable to the mortgagor for hire. [Fen-
wick v. Macey's ex'rs. 1 Dana's Rep. 286; Wilkins v. Sears,
4 Monr. Rep. 348.]

We have been thus particular in stating the rules in respect
to the rights and liabilities of mortgagor and mortgagee as they
apply with all force not only to mortgages, but, in analagous
cases, where the security is given by deed of trust. To apply
them to the case before us, and it is clear that Stout was not
chargeable with hire, so long as he was permitted to retain
the possession; but if he transferred the possession to a third
person, under a contract for the sale of his reversionary inter-
est or otherwise, that person, after demand of the slaves was
made of him by the trustee, who was entitled to the possession,
would be liable for hire.

Chambers, in virtue of the assignment of Tartt, became the
*cestui que trust* of the property which was conveyed for the
security of his assignor, and was fully substituted to his rights.
If Tartt had taken possession of the slaves, he would have been
accountable to Stout for hire, and to that extent would his lien
have been extinguished. But Chambers' possession may be
referred both to his purchase from Stout and the assignment
by Tartt; and as a purchaser he is not liable for hire previous

to the time he may have been called on to direct a sale under his deed, or some equivalent step was taken by the junior incumbrancer. Whenever this was done, the hire thereafter accruing, would be a charge upon him, and go in satisfaction of the debt of which he was assignee.

It does not appear that Chambers had the possession of both the slaves embraced in the deed for Tartt's benefit. Milley alone was in his possession, while Henry remained with Stout. There is then no pretence for charging him with the hire except as to Milley. The decree of the Chancellor in this particular, can only be sustained upon the legal hypothesis, that as Stout's possession was acquiesced in by Chambers, it shall be considered as his own. We know of no warrant for such a conclusion.

5. No question was raised in the argument as to the priority of the lien of Tartt's deed. The decree was rendered by the Court of Chancery, under the impression it was sufficiently shown by the answers, that Sledge was informed of its execution when he received his security from Stout. It is stated in the answer of Aikin, a trustee in Tartt's deed, that within thirty days after it was executed, he handed it to the Clerk of the proper County Court, duly proved, with directions to register it; but upon inquiry at the office, he learned that it had not been recorded, and upon search it could not be found in file. In addition to which, he, as well as several other of the defendants, state facts from which an express notice is inferable. Whether these answers are thus far responsive to the bill, or are evidence, or whether it would not be safer to sustain the answers by proof, we deem it unnecessary to consider at this time.

For the several errors particularly noticed in this opinion, the decree of the Court of Chancery is revered and the cause remanded, that it may be disposed of according to the principles we have laid down.